**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

SCOTT WILLOUGHBY, o/b/o §
MATTHEW WILLOUGHBY (deceased), §
§ CIVIL ACTION NO.
       Plaintiff, § 4:18-CV-00150-CAN
§
v. §
§
COMMISSIONER, SSA, §
§
       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff brings this appeal under 42 U.S.C. § 405(g) for judicial review of the final decision

of the Commissioner of Social Security ("Commissioner") denying his claim for supplemental

security income and child's insurance benefits. After reviewing the Briefs submitted by the

Parties, as well as the evidence contained in the Administrative Record, the Court finds that the

Commissioner's decision should be **AFFIRMED**.

### BACKGROUND

**I.      PROCEDURAL HISTORY OF THE CASE**

On May 9, 2014, Matthew Willoughby ("Plaintiff")[1] filed an application for supplemental

security income benefits ("SSI") under Title XVI of the Social Security Act ("Act") [TR 277-282].

On October 6, 2014, Plaintiff filed an application for child's insurance benefits ("CIB") under

Title II of the Act [TR 284-290]. Plaintiff alleged an onset-of-disability date of August 1, 1999 in

both applications [TR 277, 284]. Plaintiff's applications were initially denied by notice on

---

[1] Matthew Willoughby is the decedent on whose behalf Scott Willoughby (his father) brings this appeal. Herein, the
Court will refer to both men as "Plaintiff." "Plaintiff" refers to Matthew Willoughby through October 9, 2017 and to
Scott Willoughby on behalf of Matthew Willoughby thereafter.

March 17, 2015 [TR 205-212], and upon reconsideration on August 7, 2015 [TR 216-221]. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on October 6, 2015 [TR 222-225], and the ALJ conducted the hearing ("Hearing") on September 9, 2016 [TR 33-82, 239]. At Hearing, Plaintiff was represented by counsel, and the ALJ heard testimony from Plaintiff, his mother, and a vocational expert ("VE").

On October 13, 2016, the ALJ issued an unfavorable decision denying Plaintiff's application at step five, finding that Plaintiff is capable of performing the requirements of unskilled sedentary occupations [TR 7-32]. Plaintiff requested review of the ALJ's decision by the Appeals Council [TR 275]; the Appeals Council denied Plaintiff's request on December 8, 2017, making the decision of the ALJ the final decision of the Commissioner [TR 1-6].

On March 6, 2018, Plaintiff filed the instant suit [Dkt. 1]. On May 18, 2018, the Administrative Record was received from the SSA [Dkt. 12]. Plaintiff filed his Brief on June 17, 2018 [Dkt. 17]. The Commissioner filed its Brief in Support of the Commissioner's Decision on August 16, 2018 [Dkt. 19]. Plaintiff did not file a reply.

## II.     STATEMENT OF RELEVANT FACTS

### 1.     *Age, Education, and Work Experience*

Plaintiff was born on March 16, 1989, making him ten (10) years of age at the time of alleged onset, and twenty-eight (28) on the date of the ALJ's decision [TR 141, 277]. Plaintiff's age classification was defined as "younger person" at all relevant times. *See* 20 C.F.R. § 404.1563. Plaintiff had at least a high school education and could communicate in English [TR 41, 310]. Plaintiff had no prior work experience [TR 43, 310].

## 2. *Plaintiff's Relevant Medical Records*

In his application, Plaintiff asserted that he is disabled as a result of fibromyalgia, anxiety, depression, poly arthritis, back pain, obesity, fatigue, myalgia, low testosterone, fatty liver (non-alcoholic), panic attacks, and social anxiety [TR 309]. In connection with his impairments, Plaintiff has seen a multitude of doctors. Plaintiff attended psychotherapy with LPC-S Jeffrey Fletcher, M.A. from July 30, 2013 through September 5, 2016 [TR 678-688]. Plaintiff also received mental health treatment from psychiatrist Dr. J. Michael Brennan [TR 437, 448-52, 666-67]. Plaintiff received treatment at Dallas Diagnostic Association by Drs. Pablo Zeballos and Krishnan Nair from October 2, 2014 through August 26, 2015 [TR 503-525, 531-49, 616-24] where he was diagnosed with chronic pain syndrome, lumbosacral radiculitis, degeneration of the lumbar intervertebral disc, GERD, morbid obesity, anxiety, and depression [TR 505, 536]. Plaintiff also sought treatment for digestive health issues in the fall of 2013 [TR 425-27, 440-46].

In connection with his application for disability benefits, Plaintiff also underwent two consultative examinations. On December 9, 2014, Dr. Linda Ludden completed a mental status examination of Plaintiff [TR 470-75] and on December 17, 2014, Dr. S. Katkuri completed a physical examination [TR 481-88]. Further, on March 9, 2015 non-examining State Agency Medical Consultants ("SAMCs") Dr. Tina Ward and Dr. Jean Germain assisted in an initial-level agency determination of Plaintiff's medical conditions and functional limitations finding Plaintiff could sit, stand, and/or walk for six hours in an eight-hour workday and "understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to carry out detailed changes in routine work setting" [TR 150, 154]. On reconsideration, SAMCs Dr. Scott Spoor and Dr. Thomas Geary confirmed the assessments of Drs. Ward and Germain [TR 181, 184].

### 3. Hearing Testimony

#### a. Plaintiff and Plaintiff's Mother's Testimony

At Hearing, counsel for Plaintiff asserted that Plaintiff satisfied listings 12.04 ("Depressive, bipolar and related disorders") and 12.06 ("Anxiety and obsessive-compulsive disorders") [TR 39].  Plaintiff thereafter testified that pain and fatigue owing to fibromyalgia, headaches, low testosterone, hypothyroidism, depression, anxiety, and panic attacks, prevented him from holding employment [TR 44-45].  Plaintiff explained that he first became impaired in fifth grade when he was diagnosed with fibromyalgia [TR 41-42].  Plaintiff stated that this condition spread pain throughout his body, but most acutely to his hands, lower back, and right leg [TR 44-49].  Plaintiff elaborated that on a scale of one to ten, he experienced an average level of hand discomfort of four, but that on some days this rose to nine [TR 46].  Plaintiff explained that remedies such as heat packs, ice packs, and over-the-counter medication had not relieved this pain [TR 47].  Plaintiff described his lower back pain as "[c]onstant[ ]" and estimated its average level of discomfort at seven out of ten [TR 48-49].  He noted that this pain traveled to his right hip, knee, leg, and heel [TR 49].  Plaintiff summarized that overall, the fibromyalgia caused him great pain and fatigue, and that standing, walking, and sitting all exacerbated his discomfort [TR 48-49].  Plaintiff added that he could only walk and stand for approximately five minutes at a time, and that he could not remain in a normal seated position for more than one hour [TR 58-59].  He related that "[r]eclining or lying down in [his] bed" and elevating his feet above his waist were the only ways that that he could find relief, and that he spent most of each day in these positions [TR 49, 51].

Plaintiff stated that he took a host of prescription medications to address the fibromyalgia-induced pain and fatigue, including Gabapentin, Oxycodone, Morphine, and Skelaxin [TR 47-48, 50].  Regarding the efficacy of these medications, Plaintiff remarked, "They help.  Yes.  But even

with them I'm still in terrible pain." [TR 50]. Plaintiff noted, for example, that the Skelaxin caused both of his legs to swell [TR 50-51]. Plaintiff explained that no one was treating him for his fibromyalgia, but that Dr. Krishnan Nair was his primary care physician and that Dr. Amir Alavi was his pain management doctor [TR 47-48].

Plaintiff went on to describe his other physical impairments [TR 45, 52-54]. He explained that he experienced moderate headaches a few times per week, but that sometimes he endured "terrible headaches" that lasted up to a month [TR 52]. Plaintiff testified, however, that he did not see a doctor for this problem [TR 52]. Plaintiff also discussed his low testosterone, and explained that he previously received regular treatment from an endocrinologist [TR 53]. Plaintiff recalled that the doctor provided him supplies with which to inject himself on a regular basis, and that while his testosterone increased, he "did not notice a physical difference." [TR 53]. Plaintiff added that the endocrinologist also provided him with steroid injections, but that Plaintiff stopped receiving these because they made him gain weight [TR 45, 54]. Finally, Plaintiff related that this doctor treated his hypothyroidism by prescribing Anastrozole, but that Plaintiff had stopped taking these pills as well.

Regarding his mental impairments, Plaintiff described his depression by stating "I feel that there's no form to life. I wish I, that I, could just fall asleep and not wake up." [TR 55]. Plaintiff further discussed his "terrible anxiety;" he acknowledged that it stemmed from fear of judgment, prevented him from socializing with others, and even made him uncomfortable around his own family [TR 44, 56]. Plaintiff also confirmed that he suffered panic attacks "[m]ultiple times a day" and that these were triggered by "thinking about how messed up [his] life is." [TR 57-58]. Plaintiff explained that as a result of these conditions he had no desire to interact with people and preferred to "hide" in his room [TR 56-57]. Plaintiff noted that he had been seeing a psychiatrist

(Michael Brennan) for the last three or four years, and that except for a gap due to a "falling out," they met every three months [TR 77]. Plaintiff added that he had major difficulty sleeping and that he took Ambien with mixed results [TR 55].

As a result of the above conditions, Plaintiff testified that he spent his days alone in his bedroom watching television and movies [TR 57-58]. Plaintiff stated that he dressed himself daily, but that his back pain prevented him from bathing every day [TR 57]. Plaintiff explained that he did not cook, perform housework, or do laundry [TR 58]. Plaintiff related that he had built a computer earlier in the year, but that while he "used to be a very avid video gamer," he no longer played these games because he could not sit in his chair [TR 60]. Plaintiff also stated that in the past he would accompany his family to the gun range on "rare occurrence[s]", but that he could not do this anymore [TR 61]. He elaborated that he obtained his concealed-carry license in 2012, and that this entailed attending a four-plus hour class—an experience that Plaintiff described as "anxiety-inducing" and "uncomfortable" [TR 80]. Plaintiff testified that he pursued this activity on the advice of his therapist, who thought that this would boost his self-esteem and re-acclimate him to social situations [TR 80]. Plaintiff added that he had just one friend, and that he communicated with this friend via texting and speaking on the phone [TR 55-56].

Plaintiff's mother also testified at Hearing [TR 68-77, 78-81]. She recalled Plaintiff's fibromyalgia diagnosis when he was in fifth grade and explained that "he never got better" because the doctors did not administer or prescribe medical treatment [TR 68]. She testified that she home-schooled Plaintiff from fifth grade through the end of high school because Plaintiff's pain and fatigue prevented him from attending school in person [TR 69-70]. Plaintiff's mother echoed Plaintiff's testimony regarding his physical and mental ailments, pain, and daily routine; for example, she averred that he remained in his bedroom and did not socialize, sat in his recliner or

lay in his bed all day, and experienced regular panic attacks [TR 70-74]. She added that Plaintiff cried "[v]ery frequently" [TR 72]. Plaintiff's mother also provided that Plaintiff had seen many different medical professionals, including a counselor (Jeffrey Fletcher) and a psychiatrist (Michael Brennan) [TR 75]. She opined that Plaintiff's condition had actually worsened over the three years he had seen Mr. Fletcher, stating "He doesn't see that there's any future for him because he feels like the pain and the anxiety will never get better." [TR 76].

Finally, Plaintiff's mother answered questions about Plaintiff going to the gun range [TR 79-80]. She explained that he had gone there perhaps once in the last year and "[t]wo or three times" overall [TR 79]. She mentioned that Plaintiff attended a concealed-carry class and obtained his concealed-carry license, but clarified that Plaintiff's condition had progressed so much since then that he could not have completed this class in his present state [TR 80]. Plaintiff's mother also provided that Plaintiff kept a gun and bullets in his room [TR 81].

### b. VE's Testimony

The VE also offered testimony at Hearing in response to questions about Plaintiff's work history and hypotheticals posed by the ALJ [TR 61-67]. The VE testified that Plaintiff had no prior work experience [TR 62]. The ALJ then presented the following hypothetical to the VE:

> Okay, if you can assume a hypothetical individual of the claimant's age, education, with the past jobs you described. And further assume the individual is limited to occasional lift [sic] and carry of 20 pounds; frequently lift and carry 10 pounds. Is able to stand or walk approximately a total of six hours in an eight hour day; and able to sit approximately six hours in an eight hour day. Can occasionally climb ramps and stairs, but no climbing of ladders, ropes or scaffolds. May occasionally balance, stoop, kneel, crouch and crawl. Can understand, remember and carry out detailed but not complex instructions. Can make decisions. Can concentrate for extended periods. Can interaction [sic] appropriately with others. And can respond appropriately to changes in a routine work setting.

[TR 62-63]. The ALJ then asked whether such a hypothetical individual could perform any work in the national economy and the VE answered, "Yes" [TR 63]. The VE stated that this hypothetical

individual could work as a General Office Clerk (DOT code 209.562-010), File Clerk 1 (DOT code 206.387-034), and Administrative Clerk (DOT code 219.362-010) [TR 63].

The ALJ next presented a second hypothetical to the VE:

> Assume an individual was limited to occasional lift and carry of 10 pounds, frequently lift and carry of less than 10 pounds. Able to stand and walk approximately two hours a day total. Able to sit approximately six hours a day total. Can occasionally climb ramps or stairs; never ladders, ropes or scaffolds. Never exposed to unprotected heights. May occasionally balance and stoop. Never kneel, crouch or crawl. Able to understand and remember and carry out simple instructions, make simple decisions, attend and concentrate for extended periods. Able to interact occasionally with supervisors, coworkers and the public. Able to respond to changes in a routine work setting.

[TR 63-64]. The ALJ again inquired whether such a hypothetical individual could perform any work in the national economy and the VE answered affirmatively [TR 64]. The VE responded that this hypothetical individual could work as an Addresser (DOT code 209.587-010), Poll Clerk or Election Clerk (DOT code 205.367-030), and Surveillance System Monitor (DOT code 379.367-010) [TR 64]. The ALJ then asked the VE a long series of questions pertaining to whether an individual with various characteristics and issues—*e.g.*, indecisiveness, consistent tardiness, and inadaptability—would be precluded from performing these jobs [TR 64-67]. The VE answered "Yes" to all but one of these questions [TR 64-67]. When the ALJ inquired whether an inability to interact appropriately with the general public would preclude an individual from working these jobs, the VE responded "No" [TR 66]. Plaintiff's counsel declined to cross-examine the VE [TR 67].

## III.    FINDINGS OF THE ALJ

### 1.    *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial

gainful employment at the time of his disability claim is not disabled. 20 C.F.R. § 404.1520(b). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his RFC, age, education, or work experience. 20 C.F.R. § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(e). Finally, a claimant who cannot return to his past work is not disabled if he has the RFC to engage in work available in the national economy. 20 C.F.R. § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability and at the last step the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

### 2. *ALJ's Disability Determination*

After hearing testimony and conducting a review of the facts of Plaintiff's case, the ALJ made the following sequential evaluation [TR 11-26]. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 1, 1999, the alleged onset date [TR 13]. At step two, the ALJ determined that Plaintiff had the severe impairments of obesity, fibromyalgia, depressive disorder, somatoform disorder, spinal disorder, and anxiety-related disorder [TR 13]. The ALJ determined that Plaintiff's remaining impairments of low testosterone, fatty liver, headaches, hypothyroidism, hand pain, and GERD were not severe [TR 14]. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1 [TR 14-15]. At step four, the ALJ determined that Plaintiff had the following residual functional capacity ("RFC"):

> [C]laimant has the residual functional capacity to lift and carry ten pounds occasionally and less than ten pounds frequently. He can stand and walk 2 hours total out of an eight-hour day, and sit 6 hours total. He can occasionally climb ramps and stairs. He can never climb ladders, ropes, and scaffolds. He cannot be exposed to unprotected heights. He can occasionally balance and stoop. He can never kneel, crouch, or crawl. He can understand, remember, carry out, and make judgments related to simple "unskilled" tasks. He can interact appropriately to supervisors and coworkers, and deal with routine changes in the workplace.

[TR 16-24]. This concluded the step four analysis, as Plaintiff had no work history [TR 24]. At step five, the ALJ found that considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform such as addresser, poll clerk, and surveillance systems monitor [TR 24-25]; and, accordingly, the ALJ ruled that Plaintiff had not been disabled from August 1, 1999 through October 13, 2016, the date of the ALJ's decision [TR 25].

## STANDARD OF REVIEW

In an appeal under § 405(g), this Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). This Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995). Additionally, any conflicts in the evidence, including the medical evidence, are resolved by the ALJ, not the reviewing court. *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

Disability insurance is governed by Title II, 42 U.S.C. §§ 404 et. seq., and SSI benefits are governed by Title XVI, 42 U.S.C. §§ 1381 et. seq., of the SSA. The law and regulations governing the determination of disability are the same for both disability insurance benefits (CIB) and SSI. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The legal standard for determining disability under the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see also Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by a five-step sequential evaluation process, as described above. 20 C.F.R. § 404.1520(a) (4).

## ANALYSIS

### *1.    Obesity Consideration*

Plaintiff argues that, although the ALJ did find Plaintiff's obesity to be a severe impairment, "the ALJ never considered the impact of [Plaintiff's] obesity on his functional capabilities" [Dkt. 17 at 15]. Despite Plaintiff's claims to the contrary, the Court finds the ALJ considered the impact of obesity on Plaintiff's RFC.

The social security rulings recognize that obesity, though not a listed impairment, can reduce an individual's occupational base for work activity in combination with other elements. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(Q); SSR 02-1p, 2002 WL 34686281, at *5-7 (S.S.A. Sept. 12, 2002); *see also Beck v. Barnhart*, 205 F. App'x 207, 211 (5th Cir. 2006). Further, a claimant's obesity must be considered at all steps of the sequential evaluation process. SSR 02-1p, 2002 WL 34686281, at *3. The ALJ must perform "an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." *Id.* at *4.

In this case, the ALJ, as noted by Plaintiff, did find that Plaintiff suffered from, inter alia, the severe impairment of obesity [TR 13]. As to such obesity, the ALJ noted at least seven different treatment records or assessments in which Plaintiff was diagnosed with morbid obesity or advised to lose weight and, also referenced Plaintiff's specific BMI (65.2) as indicated on an August 31, 2015 assessment [TR 18-22]. In connection with many of these records, the ALJ noted that many of these examinations demonstrated that Plaintiff had normal gait, normal motor function, and full range of motion in his extremities [TR 18, 20, 22].

In addition, the ALJ explicitly relied on the findings of Dr. Katkuri's consultative examination whose assessment specifically addressed limitations and restrictions related to Plaintiff's obesity [TR 20]. Specifically, the ALJ noted the following in connection with Dr. Katkuri's examination:

> A consultative examination dated December 17, 2014 showed an assessment of degenerative disc disease with moderate lumbar stenosis, polyarthritis, *morbid obesity*, fatty liver, history of fibromyalgia, and history suggestive of anxiety and depression (Ex. 14F). Lumber extension and flexion were slightly reduced. Hip and knee extension and flexion were slightly reduced *due to* obesity. Hip abduction was reduced by 50% *due to* obesity. *There was no deficit in range of motion in the upper extremities.* The abdomen was normal. *The claimant's gait and station were also normal.* He was also able to stand on his heels and toes. He was able to bend and get back up without difficulty, but he could not squat and get back up due to back pain. *He had difficulty getting on and off the exam table secondary to obesity.* Straight leg raising test was negative. He had fibromyalgia tender points (10), in the neck, shoulders, upper back and hips. *Strength and hand-grip were normal.* Reflexes were 1+ *due to obesity. He was able to handle small objects.*

[TR 20] (emphasis added). Dr. Katkuri's consultative examination was consistent with the other reports contained in the record, indicating normal gait, normal range of motion, and normal motor function [TR 18, 20, 22].

Moreover, the ALJ clearly assigned partial weight to the opinions of the SAMCs who found, at both the initial level and on reconsideration, that Plaintiff was capable of standing for six

hours of an eight-hour workday and explicitly indicated that their respective RFC assessments considered Plaintiff's morbid obesity [TR 18, 150-52; 180-82]. In contrast to the assessments of the SAMCs, the ALJ actually further restricted Plaintiff's exertional and postural limitations based on the totality of the record limiting Plaintiff from the light exertional level—as assessed by both SAMCs—to the sedentary exertional level.

Regarding Plaintiff's obesity, the ALJ specifically stated:

Considering the claimant's morbid obesity and other physical impairments, he is limited to "sedentary" work.

[TR 24].

Plaintiff has failed to identify any evidence or articulate any argument that indicates decreased functioning attributable to his obesity beyond that of the sedentary exertional level as already considered by the ALJ and incorporated into the RFC determination. *See, e.g., Bergman v. Berryhill*, 2018 WL 588349, at *6 (S.D. Tex. Jan. 29, 2018); *Webb v. Astrue*, No. 4:08-CV-747-Y, 2010 WL 1644898, at *10 (N.D. Tex. March 2, 2010); *Campos v. Astrue*, No. 5:08-CV-115-C, 2009 WL 1586194, at *3-4 (N.D. Tex. June 8, 2009); *Crossley v. Astrue*, No. 3:07-CV-0834-M, 2008 WL 5136961, at *5 (N.D. Tex. Dec. 5, 2008) ("Obesity is not a per se disabling impairment and Plaintiff has offered no medical evidence that his obesity actually results in these limitations or any further limitations beyond the sedentary work level found by the ALJ.").

In light of the foregoing, the Court finds that the ALJ properly considered Plaintiff's obesity in accordance with the regulations throughout the disability determination and that substantial evidence supports the ALJ's determination—discussed further *infra*. Plaintiff's claim that "the ALJ never considered the impact of [Plaintiff's] obesity on his functional capabilities" is without merit [Dkt. 17 at 15].

## 2.     *Mr. Fletcher's Opinion—Other Source Opinion Evidence*

Plaintiff argues that the ALJ erred by "discrediting" LPC-S Fletcher's mental function questionnaire, opinions, and treatment notes and takes issue with many of the ALJ's stated reasons for discrediting Mr. Fletcher's findings—including the ALJ's speculation as to Plaintiff's honesty with Mr. Fletcher, the ALJ's comment indicating that severe social phobia should have interfered with Plaintiff's ability to keep weekly counseling appointments, and that Mr. Fletcher is not an authorized medical doctor [Dkt. 17 at 15-22]. Plaintiff argues Mr. Fletcher's treatment notes "support a debilitating level of social anxiety" and thus his opinions concluding that Plaintiff would have been unable to perform in work environment should not have been discredited and the ALJ "severely understates the record" [Dkt. 17 at 17-19]. The Commissioner responds that the ALJ properly considered and weighed Mr. Fletcher's assessments, but because Mr. Fletcher is not an acceptable medical source, his September 2014 assessment and September 2016 questionnaire are not entitled to controlling weight [Dkt. 19 at 7-10].

Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. Under the regulations, licensed professional counselors are not "acceptable medical sources." 20 C.F.R. §§ 404.1513(a), 416.913(a). Only "acceptable medical sources can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight." *Thibodeaux v. Astrue*, 324 F. App'x 440, 445 (5th Cir. 2009). Medical opinions are statements from acceptable medical sources,

such as a licensed physician or psychologist, that "reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). Only acceptable medical sources can offer medical opinions and be considered treating sources whose medical opinions may be entitled to controlling weight. *Thibodeaux*, 324 at 445. Having said that, in addition to the evidence from acceptable medical sources, the ALJ may use evidence from other sources to show the severity of the claimant's impairments and how it affects their ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(a), 416.913(d). However, as factfinder, the ALJ has the sole responsibility for weighing the evidence. The ALJ may choose whichever physician's diagnosis is most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

To determine the weight afforded to acceptable medical opinions, the ALJ considers six factors: (1) whether the source has examined the claimant; (2) whether the source has a treating relationship with the patient and the length, frequency, nature, and extent of that relationship; (3) the extent to which the source supports his findings with "relevant evidence" or explanation; (4) whether the source's opinion is consistent with the rest of the record; (5) whether the source is a specialist on the relevant medical issue; and (6) whether there are any additional factors that corroborate or counter the source's opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). For opinion evidence from other sources, such as Mr. Fletcher, the ALJ is not required to consider every weight determining factor; however, he should examine those factors applicable to the particular circumstances of a given case. *See* SSR 06–03p, at *5; *see also Adkins v. Berryhill*, No. 3:16-CV-000459-RFC, 2017 WL 1185235, at *7–8 (W.D. Tex. Mar. 29, 2017) (holding ALJ's consideration of two factors was sufficient); *Mitchell v. Astrue*, No. SA-11-CA-0751-XR, 2012

WL 2368508, at *9 (W.D. Tex. June 21, 2012) (holding ALJ's consideration of four of the six opinion weight factors of not acceptable medical source was sufficient). An ALJ's decision should sufficiently discuss the weight factors to establish why he rejected opinion evidence; it cannot be "devoid of any degree of specific consideration" of the opinion evidence. *See Cruse v. Commissioner of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007).

Because Mr. Fletcher constitutes an "other source", Mr. Fletcher is not considered or weighed like a treating source. *See Young v. Berryhill*, 689 F. App'x 819, 821-22 (5th Cir. May 26, 2017); Drury v. Colvin, 2014 WL 1056575 (N.D. Miss. 2014) (psychotherapist is not an acceptable medical source, and instead amounts to an other source). However, contrary to Plaintiff's allegations, even though Mr. Fletcher is not a treating source, it is clear that the ALJ did consider and weigh Mr. Fletcher's examinations and treatment notes [TR 19, 23]. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Regarding Mr. Fletcher's assessments, the ALJ states as follows:

> Jeffrey Fletcher, MA, reported on October 16, 2014 that the claimant attended weekly psychotherapy sessions in his office (Ex. 9F). He reported that the claimant was unable to maintain gainful employment due to physical and psychological issues. However, he reported that in the most recent examination, the claimant was properly groomed and calm. His speech was of normal rate and easily understandable. His mood was severely depressed and anxious and his affect was congruent. His thought processes were clear and goal-oriented. There was no current suicidal or homicidal ideation noted. There were no hallucinations, illusions, or dissociation. He was alert and fully oriented reporting no memory problems. He did report that concentration was difficult.
>
> The undersigned gives partial weight to this assessment. It is the responsibility of the Administrative Law Judge, on behalf of the Social Security Administration, to determine whether a claimant can work. *Mr. Fletcher's assessment is vague and conclusory without substantiating medical evidence. Mr. Fletcher is not an authorized medical doctor*, and it is unclear why the statement was not provided by a medical doctor. Mr. Fletcher's records indicated that the saw the claimant once or twice a month. There was no indication that the claimant has been properly medicated, and no records pertaining to the effects of mental health medications. The claimant received treatment and medication from numerous doctors. He also stated on occasion that he didn't take his anxiety medications. In addition, a person with such severe social phobia as alleged by Mr. Fletcher would have difficulty

attending appointments on a weekly basis. *This report is also inconsistent with exhibit 12F, and the claimant's testimony concerning his daily activities.* The claimant is able to prepare food, take gun classes, shop, build computers, and play video games. Therefore, Mr. Fletcher's allegations about the claimant's limitations are questionable.

***

Mr. Fletcher reported in September 2016 that the claimant would be expected to be absent more than four days a moth, due to panic disorder, anxiety, social anxiety, somatization disorder, agoraphobia, and depression (Ex. 30F). He would not be able to perform semi-skilled or skilled work. He could not interact appropriately with the public or coworkers, or respond appropriately to routine work-related changes. He could not accept instructions or criticism from super visors or maintain attention for two hour segments. He could carry out short simple instructions, and ask simple questions.

The undersigned gives this assessment partial weight. *It is understood that Mr. Fletcher has a long history with the claimant.* Although he reported the claimant had social anxiety that was debilitating, along with treatment notes indicating the claimant was suicidal, Mr. Fletcher did not consider that the claimant went to a gun range and had a gun with bullets in his room. It is questionable whether the claimant has been entirely honest with Mr. Fletcher.

[TR 19, 23] (emphasis added).

In assigning partial weight to Mr. Fletcher's opinions, the ALJ considered the regulatory factors as set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c). Regarding factors one and two, the ALJ expressly acknowledged that Mr. Fletcher is a psychotherapist that has a long history in conducting weekly sessions with Plaintiff. In connection with the remaining factors, the ALJ indicates that Mr. Fletcher's opinion was vague, conclusory, and without substantiating medical evidence; Mr. Fletcher is not an authorized medical doctor; Mr. Fletcher's report is inconsistent with the opinion of an acceptable medical source, Plaintiff's own testimony, and Plaintiff's reports as to his daily living.

Further, the Court notes that the ALJ also discusses Dr. Ludden's consultative examination, exhibit 12F, which the ALJ explicitly recognized as being inconsistent with the opinions of Mr. Fletcher [TR 19]. The ALJ considered, and in fact assigned partial weight to, Mr. Fletcher's

opinions. *See Guevara v. Colvin*, No. 4:15-cv-676-A, 2016 WL 2866220, at *5 (N.D. Tex. Apr. 25, 2016) (holding the ALJ's opinion properly considered an other source opinion where the ALJ described the opinion, determined it should be given no weight, and gave specific reasons as to why he rejected the opinions); *Jackson v. Colvin*, No., 2015 WL 739853, at *6 (N.D. Tex. Feb. 20, 2015) (finding the ALJ's opinion considered the other source opinions as "she briefly described them and determined that they were entitled to 'little weight'" and provided two reasons for the determination); *Naona N.E. v. Berryhill*, No. 3:17-cv-0597-D-BK, 2018 WL 5722677, at *10 (N.D. Tex. Aug. 20, 2018) (indicating the ALJ fully complied with SSR 06-03p when he determined the other source opinion was entitled to little weight because it was based on casual observations and that did not outweigh other objective findings and clinical observations); *Porter v. Barnhart*, 200 F. App'x 317, 319 (5th Cir. 2006) (holding that an ALJ did not err by refusing to find limitations based upon the assessment of a chiropractor—other source—because "the ALJ was not required to rely on the chiropractor's evaluation in making the RFC finding because a chiropractor is not an acceptable medical source" and other medical evidence did not show significant functional limitations).

An ALJ is entitled to determine the credibility of medical experts and weigh their opinions. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (upholding the ALJ's decision when it showed he carefully considered, but ultimately rejected, the treating physician's conclusions). The ALJ resolves the conflicts in evidence, not the Court. Here, the ALJ properly exercised his discretion in assigning partial weight to the opinions of Mr. Fletcher, a non-acceptable medical source, and, as discussed further below, substantial evidence supports the ALJ's ultimate RFC determination.

### 3.     *Substantial Evidence*

Plaintiff lastly argues that the ALJ erred in determining Plaintiff's RFC [Dkt. 17 at 22-28]. Specifically, Plaintiff appears to find error with the ALJ's determination that Plaintiff can stand and walk for two hours of an eight-hour workday, sit six hours, and occasionally balance and stoop [Dkt. 17 at 24] and firmly concludes after citing to various records that Plaintiff's "numerous reported abnormal medical findings are inconsistent with the ALJ's conclusion that [Plaintiff] could perform work in a competitive environment at any level on a regular and consistently acceptable level" [Dkt. 17 at 27].  In response, the Commissioner argues that substantial evidence supports the ALJ's physical and mental RFC findings [Dkt. 19 at 10].

The ALJ is responsible for assessing a claimant's RFC based on all of the relevant evidence in the record.  *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir.2005); 20 C.F.R. § 404.1546(c).  In doing so, under the Social Security Regulations, every medical opinion received must be evaluated.  20 C.F.R. § 404.1527(c).  And the ALJ determines the weight to give to a medical opinion.

In the present case, the ALJ properly weighed the evidence.  In making his argument that the ALJ's physical RFC determination is not supported by substantial evidence, Plaintiff lists various medical records detailing his diagnoses and prescribed pain medications to show that such records are consistent with his reported pain complaints and testimony [Dkt. 17 at 24-28]. However, Plaintiff fails to explain how such reports and diagnoses support a more extreme degree of functional limitations urged by Plaintiff.  *See Morris v. Astrue*, No. 4:11–CV–631–Y, 2012 WL 4468185, at *8 (N.D. Tex. Sept. 4, 2012) (explaining that a mere diagnosis of an impairment is not sufficient to establish its severity).

In determining Plaintiff's physical RFC, the ALJ discusses the examination of consultative examiner Dr. Katkuri [TR 21]. Dr. Katkuri's examination indicated that Plaintiff did not have joint tenderness in the upper or lower exterminates, he had normal gait and station, his hand grip was 5/5, normal and symmetric, there was no evidence of fasciculation or atrophy, his fine finger movements were normal, and he had the ability to handle small objects [TR 483]. The ALJ further cites to numerous relatively normal examination findings from Drs. Moparty, Kennedy, Zeballos, Johnson, Guess, and Nair [TR 425-26, 440-42, 533, 535, 544, 553, 601, 609-10, 618]. Importantly, Dr. Guess opined in a September 16, 2015 treatment note that "[Plaintiff's] pain appears to be out of proportion to what is seen on his current studies" [TR 610-11]. Finally, the ALJ expressly acknowledges assigning partial weight to the SAMCs' assessments that Plaintiff could perform light work [TR 18]. The SAMCs indicated that Plaintiff could stand, walk, and/or sit for six hours out of an eight-hour work day and occasionally stoop and balance [TR 150-151, 181]. Such findings support the ALJ's determination that Plaintiff could perform work at the sedentary exertional level.

Plaintiff next argues that the ALJ failed to consider side effects of Plaintiff's medication Skelaxin [Dkt. 17 at 24]. The law is clear that, in assessing RFC, an ALJ should consider any side effects that "could render a claimant disabled or at least contribute to a disability." *Loza v. Apfel*, 219 F.3d 378, 397 (5thCir. 2000); 20 C.F,R. § 404.1529 (c)(3)(v). On this record, however, there is little evidence that Plaintiff suffers from significant side effects because of his medication. Although Plaintiff testified that Skelaxin caused swelling in his legs, there is no objective medical evidence in the record that side effects from Plaintiff's medication were sufficiently significant to prevent Plaintiff from performing the duties that are required in sedentary work (and more specifically those required of an addresser, poll clerk, or surveillance systems monitor). *Cagle v.*

*Colvin*, No. H–12–0296, 2013 WL 2105473, at *8 (S.D. Tex. May 14, 2013) (finding subjective complaints regarding nature of side effects insufficient to require remand). Indeed, the ALJ specifically noted that multiple records showed Plaintiff was not suffering from edema or swelling [TR 426, 441, 483, 533, 535, 544, 601, 618].

In connection with Plaintiff's mental RFC, Plaintiff argues that the ALJ's labeling of Dr. Ludden's examination as "completely normal demonstrates his propensity to under value the evidence of record supporting [Plaintiff's] claim" [Dkt. 17 at 27]. To the extent Plaintiff argues that the ALJ did not properly consider Dr. Ludden's examination and opinion, the Court disagrees. Indeed, the ALJ discusses Dr. Ludden's finding in depth at two separate sections in his decision— in evaluating Plaintiff's impairments at step three and his RFC at step four [TR 15, 19-20]. The ALJ specifically assigned partial weight to Dr. Ludden's examination:

> The undersigned determines that this is a completely normal mental status examination, because the claimant report that he could begin and complete tasks when he wanted. He did not have any abnormal perceptions or paranoia. His memory, concentration, judgment, and insight were good. His hygiene was appropriate, and he was able to care for his personal needs. He was able to microwave meals. His rapport with the examiner was appropriate. He was able to shop in stores, and he had a driver's license. Although he reported some somatic complaints, and had some difficulty with agoraphobia and depression, there is no indication that the claimant could not perform work activity if he were motivated to do it. Overall, partial weight is given to Dr. Ludden's assessment.

[TR 20]. In arguing that the ALJ mischaracterized Dr. Ludden's examination as normal Plaintiff alleges that the ALJ failed to consider Dr. Ludden's diagnoses and her notes that Plaintiff had a decreased activity level, a depressed and flat speech tone, a depressed and pessimistic mood, and a flat affect [Dkt. 17 at 27]. However, again Plaintiff fails to argue how such assessments would affect the ALJ's RFC determination that Plaintiff can understand, remember, carry out, and make judgments related to simple unskilled tasks, interact appropriately to supervisors and coworkers, and deal with routine changes in the workplace [TR 16]. Indeed, despite Plaintiff's mood, Dr.

Ludden indicated that: Plaintiffs overall cooperation was assessed to be good; he maintained good eye contact; he denied delusional thoughts and hallucinations; he was oriented to person, place, time and situation; his intelligence was estimated to be average; his remote and immediate memory were satisfactory; his insight was judged to be adequate; his judgment was assessed to be satisfactory; his concentration while completing tasks were good; and no looseness of association, circumstantiality or distractive thought process was observed during the assessment [TR 473-74] Further, the ALJ noted that Dr. Ludden's consultative examination was consistent with the SAMCs' evaluations which expressly found that "claimant can understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to carry out detailed changes in routine work setting" and "interact with others" [TR 15, 154, 184]

The record makes clear that the ALJ considered multiple medical records from a variety of sources in reaching his conclusion that Plaintiff has the RFC to perform sedentary work [TR 16-24]. Of the thirty (30) exhibits containing medical records in the administrative record, the ALJ explicitly cites to and addresses twenty-seven of thirty exhibits detailing the medical opinions, reports, and evidence of Dr. Bhavani Moparty (3F), Dr. Julle Kilgore (5F, 19F), Dr. Colleen Kennedy (19F), Dr. J. Michael Brennan (6F, 27F), Touchstone Imaging Mesquite (7F-8F, 13F), LPC-S Jeffrey Fletcher (9F, 18F, 29F, 30F), consultative examiner Dr. Linda Ludden (12F), consultative examiner Dr. S. Katkuri (14F), Dr. Carlos Arauz-Pacheco (15F, 28F), Dr. Pablo Zeballos (TR 16F), Dr. Krishnan Nair (17F, 21F, 24F), Dr. Kevin Grimes (20F), Dr. Bryan Johnson (22F), Dr. James Guess (23F), Baylor Medical Center at Carrollton (25F), Dr. Amir Alavi (26F), [TR 16-24]. Additionally, the ALJ also discussed the assessments and opinions of the SAMCs, assigning their assessments that Plaintiff could perform work at the light exertional level

partial weight [TR 18]. Notably, the ALJ did not assign controlling weight to any one opinion in making his RFC determination; the ALJ explicitly noted that he assigned partial weight to the SAMCs' opinions [TR 18], Mr. Fletcher's opinions [TR 19, 23], Dr. Ludden's consultative examination [TR20], and Dr. Nair's August 2015 opinion [TR 21].

Plaintiff's primary contention essentially comes down to a disagreement with the ALJ's disposition of the evidence. However, evidentiary conflicts are for the Commissioner, not the courts, to resolve, and, to reiterate, courts "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute our own judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner's] decision." *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999) (alteration in original). Because the ALJ discussed the evidence in the record in making his RFC determination, adequately explained the reasoning for such determination, explained the weight given to multiple different opinions, and exercised his responsibility as fact finder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## **CONCLUSION**

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Legget v. Chater*, 67 F.3d 558, 565-66 (5th Cir. 1995). Having reviewed the record, this Court finds that the record demonstrates that the ALJ correctly applied the applicable legal standards, afforded proper weight to the medical opinions in the record, and that the decision of Commissioner should be affirmed.

Accordingly, it is

**ORDERED** the above-entitled Social Security action is **AFFIRMED**.

**SIGNED this 29th day of March, 2019.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE